**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

**BRIAN BOUCHER,**

**Plaintiff,**

**v.** **Case No. 25-C-1542**

**FRANK BISIGNANO,**
**Commissioner of the Social Security Administration**

**Defendant.**

---

## DECISION AND ORDER AFFIRMING THE DECISION OF THE COMMISSIONER

---

Plaintiff Brian Boucher filed this action for judicial review of a decision by the Commissioner of Social Security denying his applications for a period of disability, disability insurance benefits, and supplemental security income under Titles II and XVI of the Social Security Act. Boucher asserts that the decision of the administrative law judge (ALJ) is flawed and requires remand. For the reasons that follow, the Court concludes that the Commissioner's decision should be affirmed.

## BACKGROUND

Boucher filed an application for a period of disability and disability insurance benefits on March 30, 2022, and an application for supplemental security income on April 7, 2022, alleging disability beginning July 30, 2021. R. 15, 331–43. He listed cerebral palsy, asthma, allergies, weight problems, ADHD, ADD, and hip problems as the conditions limiting his ability to work. R. 383. After his applications were denied initially and on reconsideration, an ALJ held an administrative hearing on September 11, 2024. R. 34–63. Boucher, who was represented by counsel, a vocational expert (VE), and Boucher's great aunt, Donna Boucher, testified. R. 34, 36.

At the time of the hearing, Boucher was 22 years old and lived in a house with his mother and grandmother. R. 18, 42. Boucher testified that he completed high school, where he had to take special education classes in English due to his reading issues. R. 42–43. He testified to being 6' 3" and 425 pounds. R. 43. He stated that his typical day includes waking up around 8:00am, using the bathroom, spending time with his mother and grandmother, watching TV, playing on his phone, eating meals, and doing physical therapy exercises for about 30 minutes per day. R. 45. The physical therapy exercises include stretches, squats, rotating his back, and lifting his leg. R. 51. His chores around the house include taking out the garbage and recycling when he can. R. 45. The only other physical activity Boucher engages in is walking around his house. R. 48. Boucher testified that he rarely sees his friends in person, but when he does, they go out to eat or watch a movie. R. 45. He has no other hobbies. R. 51. He does not hold a driver's license because he does not trust himself to drive. R. 50.

Boucher testified that he held jobs at a fast-food restaurant and a grocery store in the past. R. 46. He worked in a fast-food restaurant from April 2019 to August 2020, while he was still in high school, but testified that he left the job because he had a hard time standing and keeping up with the fast pace of the restaurant. R. 46–48. However, according to the report of Dr. Neil Johnson, a medical consultant who examined Boucher on August 29, 2020, Boucher quit his A&W job "because he states they were trying to take advantage of him." R. 488. When he worked there, he worked six-hour shifts four days per week. R. 48. Boucher also worked at a grocery store as a cashier from October 2020 to August 2021, but he testified he left that job because he would forget things, had a hard time counting the money, and had difficulty standing on his feet for multiple hours throughout the day because it was painful. R. 47. According to his Disability Report,

however, he was "fired for selling alcohol at the store when [he] was under 21." R. 383. He worked at the store for about 25 hours per week. R. 49.

Boucher testified that he cannot stand or sit for long periods of time because of back pain, which he stated has bothered him his entire life. R. 44. He did not know the cause of the pain. *Id.* He also stated that walking hurts his back more quickly than just standing does, and that he had ankle pain and swelling after standing for periods of time. *Id.* Boucher further stated that his cerebral palsy does not impact him "that bad"—the main symptom was that he "can't really balance." *Id.* He stated that he cannot stand on one leg, and if he is standing on both legs he "kind of wobble[s] side to side." R. 50.

As for his mental health, Boucher testified that he has a hard time remembering things, understanding people, and reading. R. 46. His difficulty reading stemmed from his inability to concentrate. *Id.* He is on medication for ADHD, which helps him focus more and concentrate. *Id.* The only other medication Boucher takes is ibuprofen for headaches, which he takes twice per day every day. R. 50.

In addition to Boucher's testimony, his counsel presented a functional capacity exam (FCE) as an exhibit. R. 795–98. Boucher's counsel said it was "not a medical source statement, at least one that [he] would consider." R. 38. That document included a typed name, Rebecca Vissers, and several checked boxes, but it was not signed or dated. *Id.* The document also included no argument "in any direction." *Id.* Boucher's counsel stated that document was "incomplete" and that he did not find it "reasonable to argue that this constitutes a medical opinion because there's no way to test anything about that document, so we're not arguing that this [is] a medical source statement or that this is a medical opinion you have to evaluate." R. 38–39. In response, the ALJ stated "that's right," and that "[a]s it now exists, [he doesn't] know how [he] could rely [on] it."

R. 39. The ALJ also asked Boucher's counsel if he was going to follow up to find out if Vissers was going to complete the document and sign it, to which Boucher's counsel responded as follows: "based upon what my understanding [is] of what happened in the background, I think my client[] thought it was going to be completed, so because of what we got back, it's pretty clear to me we're not getting anything." *Id.*

Boucher's great aunt, Donna Boucher, also testified at the hearing. She testified that she sees Boucher every day, takes him to appointments, helps him get up the steps when he cannot on his own, makes sure his mother gives him his medications, and reminds him to take a shower. R. 52. She also testified that Boucher's reaction time is "really slow." *Id.* She did not believe Boucher could work full-time because his reaction time is not quick enough and he cannot understand what he reads. R. 53.

In response to hypothetical questions, the vocational expert testified that, considering a person of Boucher's age, education, and background with no past relevant work, with the ability to perform light work as defined by the regulations, except that the person should never climb ladders, ropes, or scaffolds, should avoid concentrated exposure to irritants such as fumes, odors, dust, and gases, should avoid all exposure to hazards such as moving machinery and unprotected heights and would be able to understand, remember, and carry out simple instructions as well as perform simple, routine tasks in a position having only simple work-related decisions, there were significant numbers of jobs in the national economy such a person was capable of performing. R. 54–55. In response to a hypothetical question adding the limitation of being off-task 15% or more of the time or missing two or more days of work per month, the vocational expert testified that "either one of those factors independently would eliminate all competitive employment." R. 55–56.

In a 13-page decision dated December 13, 2024, the ALJ concluded that Boucher was not disabled. Following the Agency's sequential evaluation process, the ALJ found that Boucher met the insured status requirements of the Social Security Act through June 30, 2022, and that Boucher has not engaged in substantial gainful activity since July 30, 2021, the alleged onset date. R. 18. Next, the ALJ determined Boucher had the following severe impairments: cerebral palsy (CP), obesity, asthma, and attention deficit hyperactivity disorder (ADHD). *Id.* He noted that Boucher's other relatively mild conditions, including but not limited to, allergic rhinitis, acute sinusitis, elevated liver enzymes and hepatic steatosis, low back pain, and a left ankle sprain were non-severe. *Id.* The ALJ found that Boucher does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 18–19.

As for the functional limitations caused by the severe physical impairments, the ALJ noted, consistent with Boucher's testimony, that his asthma was well controlled, but required avoidance of "concentrated exposure to irritants." R. 23, 85. The ALJ found that Boucher's "CP has not significantly impacted his mobility and functioning," also consistent with Boucher's testimony. R. 21, 44. The ALJ then considered the impact of Boucher's morbid obesity on his overall functioning pursuant to Social Security Ruling 19-2p. R. 21.

In considering his obesity, the ALJ noted that Boucher's obesity had significantly increased since his application for SSI. At the application stage Boucher weighed 360 pounds with a body mass index (BMI) of 45. He weighed 383 pounds in June 2022 with a BMI of 48. And at the hearing level he testified that he weighs 425 pounds with a BMI of 53.1. R. 21. The ALJ then observed that the evidence indicates Boucher's obesity "is related to excessive caloric intake and limited physical exercise." R. 24. (citing R. 633, 635, 671, 679). A December 16, 2022 entry

addressing his weight gain notes that Boucher "denies any physical activity. Sleep pattern is anywhere from 0100-0200 AM and wakes noon and lies in bed for '3 hours'. When asked why, 'bored'. Does state moving has been very stressful. And helping Mom unpack. Mom mentions he eats non-stop." R. 679.

After reviewing the record, the ALJ determined that Boucher has the residual functional capacity (RFC) to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), with the following limitations:

> [T]he claimant can never climb ladders, ropes, or scaffolds. He must avoid concentrated exposure to pulmonary irritants (such as fumes, odors, dusts and gases), and avoid all exposure to hazards (such as moving machinery and unprotected heights). In addition, the claimant is able to understand, remember and carry out simple instructions, and perform simple routine tasks, in a position having only simple work-related decisions. He can maintain concentration, persistence and pace for simple tasks in two-hour increments, over the course of a normal workday and work week.

R. 20. The ALJ found Boucher had no past relevant work and that, considering Boucher's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Boucher could perform, including routing clerk, marker, and small products assembly. R. 25. Based on these findings, the ALJ concluded that Boucher was not under a disability from July 30, 2021, through December 13, 2024, the date of the decision. R. 26. The Appeals Council denied Boucher's request for review of the ALJ's decision, making that decision the final decision of the Commissioner. R. 1.

## LEGAL STANDARD

The claimant has the burden of proving that he is disabled. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021); *see also* 20 C.F.R. § 404.1512(a)(1) ("In general, you have to prove to us that you are blind or disabled."). The Commissioner's final decision will be upheld "if the ALJ applied the correct legal standards and supported his decision with substantial evidence." *Jelinek v. Astrue*,

662 F.3d 805, 811 (7th Cir. 2011) (citing 42 U.S.C. § 405(g); *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010); *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009)). "The threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*; *Crowell v. Kijakazi*, 72 F.4th 810, 813 (7th Cir. 2023) (internal quotation marks and citation omitted). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811 (citing *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009)). The ALJ "must build an accurate and logical bridge from the evidence to his conclusion[s]." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (citation omitted); *Groves v. Apfel*, 148 F.3d 809, 811 (7th Cir. 1998)).

The ALJ is also expected to follow the Social Security Administration's (SSA) rulings and regulations. Failure to do so, unless the error is harmless, requires reversal. *See Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the Court "does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility." *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999); *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)).

## ANALYSIS

Substantial evidence supports the ALJ's decision. That evidence consists of the findings of the state-agency physicians who reviewed Boucher's file. Mina Khorshidi, M.D., who

specializes in internal medicine, found based on her review of the file that Boucher was capable of performing a limited range of light work. R. 129–32. Due to his obesity, Dr. Khorshidi opined that Boucher should never climb ladders, ropes, or scaffolds. R. 130. Dr. Usama Khayyal, M.D., who also specializes in internal medicine, affirmed Dr. Khorshidi's findings based on his review of the record on October 15, 2023. R. 156–58.

The state-agency psychological consultants, Robert Barthell, Psy.D., and John Warren, Ed.D., found only mild limitations in the four broad areas of mental functioning: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. R. 128, 155–56. Because the state-agency consultants found that Boucher had only mild limitations in these areas, known as the Paragraph B criteria, his mental impairment was considered "not severe" under 20 C.F.R. § 404.1520a(d) and no further assessment by them was required.

This evidence alone is substantial. State-agency medical consultants are "highly qualified and experts in Social Security disability evaluation." 20 C.F.R. § 404.1513a(b)(1); 20 C.F.R. § 404.1520c(c)(5). It is important to note that Boucher offered no medical opinion from any doctor supporting the more extreme limitations that Boucher alleged he had. *See Gedatus v. Saul*, 994 F.3d 893, 904 (7th Cir. 2021) ("A fundamental problem is [plaintiff] offered no opinion from any doctor to set sitting limits, or any other limits, greater than those the ALJ set."). Boucher alleges, however, that reversal is nevertheless required because the ALJ erred in evaluating the testimony regarding his symptoms and in assessing his physical and mental RFC.

**A. Subjective Symptoms**

Boucher challenges the ALJ's evaluation of his testimony and that of his great aunt, Donna Boucher, regarding his capacity for work. Boucher testified that he was unable to stand, walk, or

sit for significant periods of time. R. 44–47. In a Function Report he submitted, Boucher stated standing and walking were limited and painful. Walking was difficult because of weakness and pain. He stated he could walk about one block and then needed to rest for 15 to 20 minutes to resume. R. 404. If Boucher was so limited, it logically follows that he would be unable to engage in substantial gainful activity; he would be disabled.

But an ALJ is not required to accept a claimant's statements at face value. "There is no presumption of truthfulness for a claimant's subjective complaints; rather, an ALJ should rely on medical opinions based on objective observations and not solely on a claimant's subjective assertions." *Knox v. Astrue*, 327 F. App'x 652, 655 (7th Cir. 2009) (citing *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004)). If the rule were otherwise, there would be no reason for a hearing, for, implicit in every application for benefits, is the claimant's contention that he or she is unable to perform gainful employment. On the other hand, an ALJ may not simply disregard a claimant's subjective complaints of pain and disability.

The social security regulations set forth a two-step procedure for evaluating a claimant's statements about the symptoms allegedly caused by her impairments. *See* 20 C.F.R. § 404.1529. Symptoms are defined as "[the claimant's] own description of [her] physical or mental impairment." 20 C.F.R. § 404.1502(i). First, the ALJ determines whether a medically determinable impairment "could reasonably be expected to produce the pain or other symptoms alleged." § 404.1529(a). If so, the ALJ then "evaluate[s] the intensity and persistence" of a claimant's symptoms and determines how they limit the claimant's "capacity for work." § 404.1529(c)(1). In doing so, the ALJ considers all the available evidence as well as the following factors: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of her pain or other symptoms; (3) the precipitating and aggravating factors; (4) the type, dosage,

effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) other treatment; and (6) any other factors concerning functional limitations and restrictions due to pain or other symptoms. *See* § 404.1529(c)(3); SSR 16-3p.

"ALJ credibility determinations are given deference because ALJs are in a special position to hear, see, and assess witnesses." *Murphy v. Colvin*, 759 F.3d 811, 815 (7th Cir. 2014) (citation omitted). On judicial review, the Court must "merely examine whether the ALJ's determination was reasoned and supported." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (citing *Jens v. Barnhart*, 347 F.3d 209, 213–14 (7th Cir. 2003)). The Court is not to "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for that of the Commissioner." *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). "It is only when the ALJ's determination lacks any explanation or support that we will declare it to be patently wrong . . . and deserving of reversal." *Elder*, 529 F.3d at 413–14 (internal quotation marks and citations omitted); *see also Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019).

In this case, the ALJ found that Boucher's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, Boucher's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record. R. 21. In reaching his conclusion, the ALJ discussed Boucher's symptoms, his testimony, the objective evidence and other medical evidence, and Boucher's treatment history. R. 20–25.

Boucher claims that the ALJ "failed to provide an evidentiary basis for what, specifically, was inconsistent between Mr. Boucher's allegations and the record." Dkt. No. 13 at 16. In Boucher's view, the ALJ did not provide a sufficient evidentiary basis for his findings regarding Boucher's mobility. Review of the ALJ's decision shows otherwise.

The ALJ first addressed Boucher's "longstanding history of unspecified CP with complaints of lower extremity weakness and issues with the bilateral ankles and feet." R. 21. The ALJ noted that the record did not reflect significant limitations related to this condition because "the longitudinal physical examinations indicate the claimant has a normal gait, a full range of motion of the extremities throughout, intact sensation, and intact motor strength;" "[a]n October 2020 EMG/NCV study was normal;" and his education history did not indicate a need for any type of therapy. *Id.* The ALJ also considered Boucher's morbid obesity in making the finding that his mobility and functioning were not significant limitations, again noting that "the longitudinal physical examination findings indicate the claimant has a normal gait, a full range of motion of the extremities throughout, intact sensation, and intact motor strength." R. 22.

The ALJ did not err in considering the medical findings in assessing Boucher's subjective complaints. SSR 16-3p, the Social Security Ruling that explains how the agency evaluates symptoms in disability cases, states that objective medical evidence can be used to assess a claimant's reported symptoms. The Ruling explains that "the intensity, persistence, and limiting effects of many symptoms can be clinically observed and recorded in the medical evidence." 2017 WL 5180304, at *5. It notes that findings of "reduced joint motion, muscle spasm, sensory deficit, and motor disruption . . . may result from, or be associated with, the symptom of pain." *Id.* When the medical findings "are not consistent with other evidence in the record," the Ruling explains, "they may be less supportive of an individual's statements about pain or other symptoms than test results and statements that are consistent with other evidence in the record." *Id.* SSR 16-3p offers the following example of when medical findings are inconsistent with a claimant's statements about pain or other symptoms:

> [A]n individual with reduced muscle strength testing who indicates that for the last year pain has limited his or her standing and walking to no more than a few minutes

> a day would be expected to have some signs of muscle wasting as a result. If no muscle wasting were present, we might not, depending on the other evidence in the record, find the individual's reduced muscle strength on clinical testing to be consistent with the individual's alleged impairment-related symptoms.

2017 WL 5180304, at *5. The ALJ cited medical findings regarding Boucher's strength, range of motion, sensation, and gait in explaining the basis for his conclusion that Boucher was capable of performing light work and why his statements concerning his limitations were not consistent with the medical record. Both state-agency medical consultants cited the same findings. R. 130–31, 157–58.

The ALJ also found the consultative examination conducted by Dr. Neil Johnson to be partially persuasive, finding the examination "internally consistent related to a slight limp, the inability to tandem walk, and morbid obesity; and supported by the claimant's history of CP and morbid obesity." R. 22. The ALJ continued, stating that such evidence does not support limitations regarding inclines and uneven surfaces, as Dr. Johnson thought it did, again due to the findings of his longitudinal physical examinations. *Id.* Nonetheless, the ALJ credited Boucher's subjective complaints of lower extremity weakness and reported falls, along with his history of obesity, in limiting him to light work and further found that he could "never climb ladders, ropes, or scaffolds, and must avoid all exposure to hazards, such as moving machinery and unprotected heights." *Id.*

Although the ALJ did not fully credit Boucher's statements, it is clear from his reasoning that he did not wholly disregard them. The ALJ considered his complaints of weakness and other mobility issues and imposed limitations on those grounds. Further, an ALJ need only "minimally articulate reasons for crediting or rejecting evidence of disability." *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992); *see also Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012). He did so here when he noted which evidence undermined Boucher's testimony; namely, the longitudinal

physical examinations. For these reasons, the ALJ's conclusion about Boucher's statements is supported by the evidence, is not "patently wrong," and does not necessitate remand. *Elder*, 529 F.3d at 413–14.

Boucher also takes issue with the ALJ's consideration of his great aunt's testimony. He claims the ALJ never considered her testimony that Boucher functions at a slower pace and has a delayed reaction time and did not discuss whether this testimony was consistent with the other evidence in the record. Dkt. No. 13 at 17. On this point, the ALJ stated:

> Donna Boucher, the claimant's great aunt testified at the hearing that she sees the claimant on a regular basis and assists him in any manner that he needs, including driving him to his appointments, making sure he takes his medications, assist him with stair climbing, and reminds him to shower. She opined that the claimant cannot work in a competitive job because he has difficulty counting money, functions at a slower pace, and has a delayed reaction time. The undersigned has considered the testimony of Ms. Boucher.

R. 24.

The Commissioner was not required to credit his great aunt's opinion that Boucher "cannot work a competitive job" for two reasons. First, she is not a medical source. *See* 20 C.F.R. § 404.1520c(d) ("We are not required to articulate how we considered evidence from nonmedical sources using the requirements in paragraphs (a)-(c) in this section."). Second, the determination of whether a person is disabled is reserved to the Commissioner. 20 C.F.R. § 404.1527(d)(1). The balance of her testimony was considered by the ALJ but did not change the result.

Contrary to his great aunt's testimony, the ALJ found that Boucher's mental limitations were not so severe as to render him disabled. In reaching this conclusion, the ALJ relied upon the assessments of the state-agency psychological consultants, who in turn relied upon the facts recounted in their reports from their review of the entire file R. 24, 128, 155. Thus, in partially adopting the opinions of the state-agency consultants, the ALJ adopted their reasoning as well. *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) ("Thus, although the ALJ did not explicitly

consider [plaintiff's] obesity, it was factored indirectly into the ALJ's decision as part of the doctors' opinions.").

In short, the ALJ did not err in assessing the statements and testimony offered by Boucher and his great aunt in support of his claim. The ALJ's analysis was not patently wrong.

**B. Mental RFC Assessment**

Boucher next asserts that the ALJ erred in assessing his mental RFC. An RFC is an assessment describing the extent to which an individual's impairments may cause physical or mental limitations or restrictions that could affect his ability to work. SSR 96-8p, 1996 WL 374184, at *2. The RFC represents "the maximum a person can do—despite his limitations—on a 'regular and continuing basis,' which means roughly eight hours a day for five days a week." *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013) (quoting SSR 96-8p). In forming the RFC, an ALJ must review all of the relevant evidence in the record and "consider all limitations that arise from medically determinable impairments." *Thomas v. Colvin*, 745 F.3d 802, 807 (7th Cir. 2014). An RFC assessment "is a matter for the ALJ alone" to decide. *Id.* at 808. The ALJ must consider the "entire record" and "is not required to rely entirely on a particular physician's opinion." *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007). In assessing a claimant's RFC, the ALJ has the responsibility of resolving any conflicts between the medical and nonmedical evidence. *Pepper*, 712 F.3d at 363. The Court's task is "to determine whether substantial evidence supports the ALJ's RFC conclusion." *Id.*

As noted above, the only psychological experts of record to evaluate Boucher's mental impairments, the state-agency consultants, rated him as having at most mild limitations in the Paragraph B criteria and assessed no mental limitations. R. 128, 155. The ALJ concluded, however, that Boucher had "a moderate limitation in the ability to concentrate, persist, and

maintain pace." R. 24. In reaching this conclusion, the ALJ found the opinions of the state-agency consultants "partially persuasive related to mild limitation in the ability to understand, remember, and apply information, interact with others, adapt or manage oneself." *Id.* The ALJ found their opinions "consistent and supported by the explanation and supported by the record of stable mental health, the lack of therapy, the claimant's positive response to medication, and the normal mental status examinations." *Id.* Notwithstanding the opinions of the state-agency psychological consultants, however, the ALJ elected to give "greater consideration" to Boucher's "history of ADHD and his complaints of on-going limitations in the ability to complete tasks, concentrate and focus." *Id.* In assessing his capacity for concentration, persistence, and pace, the ALJ explained:

> The evidence references history of attention deficits as reflected by diagnoses of ADHD and ADD with complaints of difficulty staying on task and the inability to focus (Ex. B9F). Although the claimant alleges concentration deficits, the evidence indicates he is able to tend to his personal cares, prepare simple meals, perform household chores, use the computer to shop, manage money, follow a television program, and play games (Ex. B6E).

R. 20. To accommodate the additional limitation he had found, the ALJ included the following restriction in Boucher's RFC: "the claimant is able to understand, remember and carry out simple instructions, and perform simple routine tasks, in a position having only simple work-related decisions, can maintain concentration, persistence and pace for simple tasks in two-hour increments, over the course of a normal workday and work week." R. 23.

Boucher argues that the ALJ failed to provide a "logical bridge" between the mental health related evidence and the assessed RFC. In his view, the ALJ's summary of the mental health related evidence, including the moderate limitation in concentration, persistence, and pace (CPP), does not translate to the ALJ's work-related limitation to simple tasks. In support of his argument, Boucher cites cases in which the ALJ adopted the state-agency psychologist's opinion that the claimant had moderate limitations in CPP, and then translated that finding and any additional

limitations the state-agency psychologist checked on the Mental RFC form, into a capacity to perform simple work-related tasks with simple instructions. *See, e.g.*, *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 621 (7th Cir. 2010); *Yurt v. Colvin*, 758 F.3d 850, 857–59 (7th Cir. 2014); *Martin v. Saul*, 950 F.3d 369, 373–74 (7th Cir. 2020).

In this case, however, neither of the state-agency consultants who reviewed the record found more than mild limitations in Boucher's ability to maintain CPP. As a result, they offered no work-related CPP limitations for the ALJ to translate into Boucher's RFC. Based on the limitations he found from the evidence as a whole, independent of the state-agency consultants, the ALJ concluded that Boucher was "able to understand, remember and carry out simple instructions, and perform simple routine tasks, in a position having only simple work-related decisions, [and that he] can maintain concentration, persistence and pace for simple tasks in two-hour increments, over the course of a normal workday and work week." R. 23. Boucher can point to no medical findings that suggest any limitation beyond those the ALJ included in his RFC. Absent any medical evidence calling for any greater limitation, the Court cannot say that the ALJ erred in translating the limitation he had found into Boucher's mental RFC. *See Dudley v. Berryhill*, 773 Fed. App'x 838, 843 (7th Cir. 2019) ("When no doctor's opinion indicates greater limitations than those found by the ALJ, there is no error.") (citing *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004)).

**C. Physical RFC Assessment**

Boucher's last claim is that the ALJ erred in assessing his physical RFC. As was the case above, in assessing a claimant's RFC, the ALJ has the responsibility of resolving any conflicts between the medical and nonmedical evidence. *Pepper*, 712 F.3d at 363. The Court's task is "to determine whether substantial evidence supports the ALJ's RFC conclusion." *Id.*

Boucher first takes issue with the findings of the State Agency medical consultants, which the ALJ credited in finding that Boucher "can never climb ladders, ropes, or scaffolds, and must avoid all exposure to hazards, such as moving machinery and unprotected heights." R. 22; Dkt. No. 13 at 9–10. Boucher claims the consultants provided no specific link between his obesity and the limitations they found appropriate on that basis.

This argument ignores the "RFC Additional Explanation" sections of the reports completed by the two state-agency consulting physicians. Both doctors noted that they saw no evidence of severe cerebral palsy or asthma in the record and cited entries in the medical record that showed that Boucher could perform the activities of daily living with no assistive devices, that he had no problem using his hands, that while he had evidence of a limp in February of 2020, he had a normal gait in January 2021. Medical records also consistently showed 5/5 strength in his extremities, normal range of motion in his joints, with no motor or sensory deficits. The doctors also noted that Boucher had worked in a grocery store from October 2020 through August 2021, and expressly noted that they had considered Boucher's obesity in formulating his RFC. R. 130–32; 157–58. They expressly cited obesity as the reason for the postural and environmental limitations they found. R. 130, 157. Boucher obviously disagrees with these findings, but it is not true that the physician consultants failed to offer any explanation for how they arrived at their findings.

Boucher next argues that the ALJ erred by failing to provide a logical bridge between the limitation to light work and the evidence of lower extremity weakness, obesity, a limp, and longitudinal examinations. Dkt. No. 13 at 10. Although Boucher admits that the State Agency medical consultants' opinions "alone may have been enough to substantiate the ALJ's determination," he argues that this case is different because there is significant evidence in the record that post-dates the consultants' review. *Id.* at 9. In particular, Boucher claims that the

physical therapy records and the functional capacity evaluation (FCE) conducted by Robin Frenzel in September 2024 undermine the consultants' findings. *Id.* at 11.

To begin, the ALJ did not err in continuing to rely on the medical opinions of the State Agency consultants despite the later-submitted evidence, including the physical therapy records and FCE. True, the Seventh Circuit has said that "[a]n ALJ should not rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion." *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018). But if later records merely corroborate an already-known condition or bear resemblance to other treatment records, the ALJ does not err in continuing to rely on the prior State Agency consultants' opinions. *Pavlicek v. Saul*, 994 F.3d 777, 783–84 (7th Cir. 2021); *Durham v. Kijakazi*, 53 F.4th 1089, 1095–96 (7th Cir. 2022).

Here, the physical therapy note found reduced lumbar range of motion and low back pain, both of which caused "difficulty in performing activities of daily living such as bending, standing, walking, lifting and other weight-bearing activities." R. 775. But that note resembles the records from the State Agency consultants, which noted Boucher's reported symptom of pain and limitations in activities of daily living. R. 129, 156. Thus, the physical therapy note is not a "new, significant medical diagnos[is]" sufficient to show that the ALJ erred here. More importantly, Boucher was found to be a good candidate for physical therapy, and he had a "good prognosis to achieve goals," which included reduction in pain with walking and full lumbar range of motion within six weeks. R. 775.

The same is true with regard to the FCE. Although Robin Frenzel "opined" that Boucher could frequently sit, occasionally walk, and rarely stand, the actual examination showed a "normal range of motion" and "5/5 strength for all musculoskeletal areas evaluated." R. 24 (citing R. 803–

06). The FCE also noted that claimant reported "low back discomfort and lower extremity weakness." *Id.* The examination thus repeated the symptoms that the State Agency consultants were aware of, and otherwise did not show new, significant limitations that the ALJ should have considered.

In almost every case, ALJs are presented with medical records that post-date the reports of the state-agency medical consultants. If the mere fact that more recent medical records are offered at or just prior to the hearing was enough to require remand, the Agency's ability to resolve claims would be even further delayed. Given the nature and substance of the additional medical records, the ALJ did not err in continuing to rely on the opinions of the State Agency medical consultants.

The ALJ also did not err by interpreting medical evidence on his own to determine Boucher's functional limitation. Citing *Stage v. Colvin*, 812 F.3d 1121 (7th Cir. 2016), Boucher claims that the ALJ "had no basis nor expertise to weight raw objective medical data in reaching conclusions about work-related limitations." Dkt. No. 13 at 14. "But *Stage* concerned an ALJ's improper interpretation of MRIs and the need for a hip replacement without the assistance of a medical expert." *Strand v. O'Malley*, No. 22-C-1529, 2023 WL 9017166, at *4 (E.D. Wis. Nov. 29, 2023). Here there was no imaging or medical data that the ALJ interpreted. Rather, the ALJ fulfilled his duty to review both the medical opinions and evidence in the record in formulating Boucher's RFC. Although Boucher "may disagree with the ALJ's conclusions, it is not the court's role to reweigh the evidence or substitute its judgment for that of the ALJ." *Id.*

Boucher also seems to suggest that the ALJ "cherry-picked" by adopting many of the findings in the FCE, but taking "issue with only one conclusion which, if adopted, would have resulted in a finding of disability." Dkt. No. 13 at 15. This argument completely ignores the fact that the conclusion the ALJ did not adopt was the conclusion he found inconsistent with the other

evidence in the record and the results of the physical examination itself. The fact that the ALJ failed to adopt one conclusion in the FCE does not equate to cherry-picking. Rather, such weighing of evidence is "precisely within the purview of the ALJ—and it is not [the court's] place to reweigh evidence, even where reasonable minds might disagree about the outcome." *Bakke v. Kijakazi*, 62 F.4th 1061, 1068 (7th Cir. 2023) (citing *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021)).

Lastly, Boucher takes issue with several statements the ALJ made in evaluating the FCE. First, Boucher argues that the ALJ erred in noting Robin Frenzel "completed a one-time examination, is not a treating provider, and did not appear to review any treatment records." R. 24. The regulation governing how to consider medical opinions plainly rebuts this argument. Indeed, that regulation *instructs* the ALJ to consider the "length of time a medical source has treated [the claimant]," "the frequency of [the claimant's] visits with the medical source," "the purpose for treatment [the claimant] received," and "evidence showing a medical source has familiarity with the other evidence in the claim." 20 C.F.R. § 404.1520c(c). Boucher also claims that the ALJ erred when noting that the FCE had not been adopted by any treating providers. Again, the regulations instruct the ALJ to consider the consistency of the medical opinion at issue; the ALJ noting that the FCE was not adopted by a treating physician simply shows that a factor that could make the FCE more persuasive was not present in this case. *See, e.g.*, *Webb v. Colvin*, No. 15-CV-0898, 2016 WL 5107086, *4 (E.D. Wis. Sept. 20, 2016) (stating that a doctor reviewed the FCE and explaining how the opinion of the doctor and the FCE aligned); *Pape v. Colvin*, No. 13-CV-236-JDP, 2014 WL 4186827, at *5 (W.D. Wis. Aug. 21, 2014) (noting that plaintiff's primary treating physician adopted the FCE and it was thus a part of his opinion). Finally, Boucher asserts that the ALJ's statement that the FCE was not signed was an error. Seventh Circuit case law flatly rejects that argument, finding that reliance on an unsigned opinion can serve as reversible error.

*Terry v. Astrue*, 580 F.3d 471, 476–77 (7th Cir. 2009) ("An unsigned medical evaluation cannot be the kind of substantial evidence we would need to uphold the ALJ's RFC determination, and so this issue requires remand to the agency.").

In sum, the ALJ's findings are supported by substantial evidence. Thus, Boucher has not shown reversible error in the ALJ's determination of his physical RFC.

**CONCLUSION**

For the above reasons, the decision of the Commissioner is **AFFIRMED**. The Clerk is directed to enter judgment in favor of the Commissioner.

**SO ORDERED** at Green Bay, Wisconsin this 17th day of November, 2026.

William C. Griesbach
United States District Judge